# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER SCARLETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09-3324-CV-S-DGK |
| | ) | |
| THE SCHOOL OF THE OZARKS, INC. | ) | |
| d/b/a COLLEGE OF THE OZARKS, | ) | |
| | ) | |
| Defendant. | ) | |

## SUMMARY JUDGMENT ORDER

This lawsuit arises from allegations that Defendant College of the Ozarks discriminated against Plaintiff Christopher Scarlett, a student at the College, on the basis of his race. Pending before the Court is Defendant's Motion for Summary Judgment (doc. 54).

The motion is GRANTED IN PART. The Court finds sufficient circumstantial evidence to establish a prima facie case of race discrimination under both § 1981 and Title VI. Although the College has articulated a legitimate, non discriminatory reason for its actions, Scarlett has presented sufficient evidence of pretext to allow these claims to proceed to trial. However a five-year statute of limitations applies to Plaintiff's Title VI claims, thus allegations one and two in paragraph sixty-three of the Complaint (relating to Scarlett being placed on work probation and demoted to an undesirable work station), are time-barred.

### Summary Judgment Standard

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party who moves for summary judgment bears the

burden of showing that there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). When considering a motion for summary judgment, a court must scrutinize the evidence in the light most favorable to the nonmoving party, and the nonmoving party "must be given the benefit of all reasonable inferences." *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir. 1991) (citation omitted).

To establish a genuine issue of fact sufficient to warrant trial, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party must set forth specific facts showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 248. But the nonmoving party "cannot create sham issues of fact in an effort to defeat summary judgment." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 402 (8th Cir. 1995) (citation omitted).

**Facts**

Viewing the evidence in the light most favorable to the Plaintiffs, for purposes of resolving the pending motion the Court finds the facts to be as follows. Argument, facts immaterial to the resolution of the pending motion, facts not properly supported by the cited portion of the record, and contested legal conclusions have been omitted.

Plaintiff Christopher Scarlett is a black skinned person from Jamaica. From the Spring of 2004 through the Fall of 2005 he was a student at Defendant School of the Ozarks, Inc., d/b/a College of the Ozarks ("the College").

The College is a work college. All fulltime students are required to participate in the College's work program. Students participating in the work program either work fifteen hours per week or an average of fifteen hours per week during the fall and spring semesters when

classes are in session. In addition, students participating in the work program work two weeks when classes are not in session. A student's cost of education is met by participation in the work program and a combination of private, institutional, and federal/state student aid. Some students also participate in the summer work program. Students participating in the summer work program earn credit towards room and board expenses for the following academic year.

Scarlett learned about the College from his older sister, Ebony, who graduated from the College. Plaintiff is temporarily in the United States on an F-1 student visa. The College is required by the federal government to keep Integrated Postsecondary Education Data System (IPEDS) records. The federal government requires the College to keep IPEDS records regarding the ethnicity of its students. The College's records classify Scarlett as a nonresident alien and also contain a picture of him.

As a foreign student Scarlett did not qualify for any federal or state assistance or financial aid. His cost of education was paid entirely by the College. During the fall 2004 semester, the College participated in the Federal Pell Grant program, the Federal Supplemental Educational Opportunity Grant ("SEOG") program, and the Federal Work Study program.

During Plaintiff's time as a student at the College Dr. Mayburn Davidson was the Dean of Work, Dr. Chris Larsen was the Dean of Students, Dr. Marci Linson was the Dean of Admissions, Dr. Marilyn Graves was the Dean of the College, and Dr. Howell Keeter was a Vice President of the College.

**The College's policies, procedures, and practices.**

Dean Davidson's primary responsibility was to administer the College's work program. During Scarlett's time at the College the work program was governed by written policies set out in the Student Handbook. The criteria for placing a student on probation in the Student

Handbook did not mandate probation if a work supervisor requested that a student be transferred to another work station. Davidson claims the program was also administered pursuant to other unwritten policies, practices, and procedures, but he could not identify exactly what those were. A former student and faculty member at the College testified that she had never heard about unwritten regulations that might govern the student work program, and that to her knowledge no written or unwritten regulation required a student to be placed on work probation if the student's work supervisor asked the Dean of Work to transfer the student to another work station.

The Student Planner provides that, "Work program policies are formulated by the Dean of Work who is also charged with the enforcement of these policies," but no written policy explicitly gave Dean Davidson discretion to place students on work probation, or to dismiss a student from the work program. Although there was no written policy stating that a student would be placed on work probation if a work supervisor asked the student to be reassigned, Dean Davison generally placed a student on work probation if the work supervisor asked that a student be reassigned.

Dean Linson's primary responsibility was to administer the College's student admissions process. The College asserts Dean Linson administered the admissions process pursuant to certain written and unwritten policies, practices, and procedures.

If a student sought approval to change from a residence hall student to a commuter student or from a commuter student to a residence hall student, the student had to complete an application for change of status. The application for change of status was sent for input to the Dean of Students, the Dean of Work, and the Dean of the College, and then Dean Linson made the decision to approve or deny the application.

Some applications for admission to the College were reviewed and voted upon by an Admissions Committee, which was comprised of the Dean of Admissions, the Dean of Work, the Dean of the College, and the Dean of Administration.

Dr. Keeter has worked for the College for approximately 40 years and has held a number of job titles and executive duties. During Dr. Keeter's tenure at the College he has periodically asked the Dean of Admissions to admit a student without going through the typical procedures for admissions applications. When Dr. Keeter made such requests of Dean Linson, Dean Linson had discretion to admit the students as requested by Dr. Keeter without requiring the admissions committee to review and approve the students' applications for admission.

**Scarlett's first three and a half years at the College.**

In January 2001, Scarlett began attending the College as a residence hall student. Scarlett's work assignment for the spring 2001 semester and the first summer 2001 work term was the Friendship House. His work assignment for the second summer 2001 work term and the fall 2001 semester was the Warehouse. His work assignment for the spring 2002 semester and the first summer 2002 work term was the Computer Center. Scarlett did not participate in the summer work program for the second summer 2002 work term.

Dean Davidson claims he reassigned Scarlett to a different work station for the fall 2002 semester because he believed there had been a problem with his performance at the Computer Center. Davidson placed Scarlett on work probation for the fall 2002 semester. Plaintiffs work assignment for the fall 2002 semester was the Friendship House.

In October 2002, Scarlett applied for a change of status from a residence hall student to a fulltime commuting student. The College approved his change of status application, and he started the spring 2003 semester as a fulltime commuting student.

5

In January of 2003 Scarlett was removed from work probation.

Scarlett's work assignment for the spring 2003, fall 2003, and spring 2004 semesters was the warehouse. He did not participate in the summer work program in 2003 or 2004. Rick Pangborn, Scarlett's supervisor at the warehouse, gave him a spring 2004 work grade of 82. After Pangborn gave him the grade, Scarlett worked at least one more fifteen hour week and two forty hour weeks in May 2004 to fulfill his work program obligation. The parties dispute whether Scarlett's work performance declined immediately after he was given his grade. Pangborn recalls one instance in which Scarlett defied a specific instruction not to place his feet on the dash of a new College van.

In the summer of 2004, Pangborn requested that Davidson assign Scarlett to a different work station for the fall 2004 semester. Pangborn would not have requested Scarlett be reassigned if he had known that Scarlett would be placed on work probation.

Davidson placed Plaintiff on work probation for the fall 2004 semester, but during the summer and fall of 2004 Davidson never informed Scarlett, either verbally or in writing, that he was on work probation. This work probation was not documented until after Scarlett was dismissed from the College.

Prior to the start of the fall 2004 semester Scarlett submitted a form which indicated his work preferences. Davidson placed students in their work assignments. Scarlett's three preferences were for intramurals, the warehouse, and the hospital, in that order. Davidson did not grant any of Scarlett's requests, but during this time period there were white seniors who had their work requests granted.

To work with intramural sports Scarlett would have been assigned to the Physical Education Department. The Physical Education Department sometimes had a list of students that

6

were interviewed and pre-selected by the Department. If there is a list, students on the list normally have to wait a semester or two to receive a work assignment in the Department. Davidson did not assign Plaintiff to work in the Physical Education Department and claims he does not remember if there was a list.

Davidson claims Scarlett was not assigned to the warehouse because Pangborn had previously asked that Scarlett be reassigned to a different work station, although Pangborn testified in his deposition that he was willing to have Christopher continue working at the warehouse.

Davidson claims he did not assign Scarlett to the Hospital because he did not have any vacancies for student workers there. As the administrator who assigns work assignments, however, Davison had the power to assign Scarlett to any work station.

Davison assigned Scarlett to work in the campus laundry. Davidson claims he believed Scarlett could be successful there because the campus laundry is well supervised, and Scarlett had a class schedule that allowed him to work in the morning when the campus laundry most needed help.

**The week before the fall 2004 Semester.**

On August 17, 2004, Scarlett totaled his car in an accident.

On or about August 20, 2004, Plaintiff met with Dean Davidson. Davidson told him that he had been assigned to work in the campus laundry for the fall 2004 semester, but did not tell him that he had placed him on work probation.

During the week before the semester started, Plaintiff obtained his work schedule from Scott Ogden, the supervisor of the campus laundry. Plaintiff was scheduled to work mornings,

7

starting at 8:00 a.m. Plaintiff asked Ogden to change his schedule to allow him to work later in the day. Ogden refused.

**The fall 2004 Semester.**

The Fall 2004 semester began on Monday, August 23, 2004, but Scarlett did not work any of his scheduled work shifts because he was living in Seymour, Missouri and no longer had a car. Scarlett attended some of his classes by catching rides with friends, but he was at the mercy of his friends' schedules. Dean Davidson learned of Scarlett's failure to attend work from Ogden.

On August 23 or 24, 2004, Scarlett filed an application for change of status from a fulltime commuting student to a residence hall student so he could live on campus. Upon receiving the application, Dean Linson forwarded copies of the application to the Dean of Students, Dean of Work (Davidson), and Dean of the College. On August 25, 2004, Davidson placed a note on Plaintiff's application for change of status. It read,

> got runned off from his job at the warehouse (end of Spring), is on work probation, has not worked a minute so far this Fall, I planned to dismiss him if he didn't get to work today, for his continued refusal/failure to report to work ... hard for me to be enthusiastic about his returning to the dorm!!

Dean Linson read Davidson's note and denied Scarlett's application for change of status because she saw no reason to admit him to a residence hall if he was going to be dismissed from the work program. Linson sent Scarlett a letter dated August 31, 2004, stating that his application for change of status had been denied.

On August 25, 2004, Dean Davidson drafted a letter to Scarlett informing him that he "ha[s] been dismissed from the College of the Ozarks student work program." Davidson cannot

8

recall writing a letter of dismissal for any white student who did not show up at their scheduled work time for three days.

Davidson did not immediately give the letter to Scarlett. Davidson did not meet with Plaintiff on August 27, 2004, so he was not able to give Plaintiff the letter that day.

On August 30, 2004, Davidson verified that Scarlett had not worked any time whatsoever during the Fall 2004 semester. Later that day, Davidson met with Plaintiff, told him he was being dismissed from the work program, and gave him the previously drafted letter. Davidson gave Scarlett three options for the Fall 2004 semester: (1) withdraw, (2) switch to part-time status, or (3) move into the campus dorms. With his dismissal from the work program Scarlett was no longer qualified to attend the College full-time. Davidson knew that because Scarlett had an F-visa he could not switch to part-time status. Davidson also knew that by sending the note to Dean Linson he had effectively blocked Scarlett from moving into the campus dorms.

There are material facts in dispute concerning why Davidson dismissed Scarlett from the work program. The parties agree Davison did not dismiss Scarlett solely because he fell behind on work hours.

In previous situations where white students had fallen behind in work hours and Davidson had given them options about what they needed to do in order to remain in the work program, Davidson had never attempted to oppose or thwart any of those options. There were also white students at the College in the fall of 2004 who were not trying very hard and who were not put on work probation.

At least one white student around this same time period was permitted to make up work hours missed. At least one white student during this same time period was permitted to make a cash payment to the school in lieu of making up deficient work hours. Additionally, the

9

College's written policies governing the work program do not state that a student will be dismissed from the work program if the student is unable to attend the first week of the semester.

**September 2004 meeting with Davidson.**

In September 2004, Scarlett's father, Reverend Bernard Scarlett, and Scarlett's U.S. sponsor, Linda Blunt, met with Dean Davidson at Rev. Scarlett's request. During this meeting Davidson told them that Scarlett was not permitted to move into the dorms because Scarlett was a senior and a foreign student; that he (Davidson) could not do anything about Scarlett's expulsion; that the board he sat on agreed that if any student missed a week of work, then there was no need for the College to work with that student any longer; and that the Admissions Committee would not meet until October 12th to discuss Scarlett's application for readmission.

**Scarlett's readmission and graduation.**

On September 7, 2004, Scarlett applied for readmission to the College for the Spring 2005 semester. The Admissions Committee met on or about October 12, 2004, and voted to deny Scarlett's application. Davidson opposed re-admitting Scarlett. In the past though Davidson had taken steps to help re-admit a white student whom he had dismissed for poor work performance. On or about October 14, 2004, Dean Linson sent Scarlett a letter stating that his application had been denied.

The policies that governed admission and re-admission to the College are set out in pages six through eleven of the 2003-2005 College Calendar. In her deposition Dean Linson stated that unwritten polices apply to students seeking re-admission. These unwritten policies amount to seeking unspecified input from the Academic Dean, the Dean of Students, the Dean of Work, and information from the student account department.

A student's work history is documented by the work evaluations the student earns each semester. It is unclear whether the Admissions Committee took into account Scarlett's work

history when he applied for readmission. Dean Linson did not know whether other former students readmitted in the 2004-2005 school year had higher or lower work grades than Scarlett. The rejection letter the Admissions Committee sent Scarlett did not cite his prior work history as a reason for rejecting his application. Linson testified Scarlett was denied re-admission because of his work history.

In December of 2004 Scarlett's faculty advisor, Angie Davis, filed a formal complaint of race discrimination with the College regarding his treatment. Within three weeks Dr. Keeter asked Dean Linson to readmit Scarlett to the College. Dr. Keeter believed that the work supervisors' treatment of Scarlett was, in some sense, underhanded.

At Dr. Keeter's request, Dean Linson admitted Plaintiff for the Spring 2005 semester. After Scarlett returned to the College, Davidson observed Scarlett playing basketball when he thought he was scheduled to be working, and he investigated by going to Scarlett's work station and seeing if he was clocked-in. Davison did not do this with respect to any white students.

Plaintiff attended the College in the Spring 2005 and Fall 2005 semesters. In December 2005, Plaintiff graduated from the College with a bachelors of science in business administration.

**Discussion**

Count I of the Complaint alleges the College violated 42 U.S.C. § 1981 by preventing Scarlett from making and enforcing contracts on the basis of race, specifically by refusing to admit him to the campus dorms and by denying him timely re-entry to the College.[1] Count II alleges the College violated 42 U.S.C. § 2000d by unlawfully discriminating against him on the basis of his race.

---

[1] The Complaint alleged nine § 1981 violations. On June 8, 2010, the Court dismissed the bulk of these claims as time-barred, the exceptions being allegations concerning his admission to the campus dorms and his readmission to the College.

11

**I.      The College is not entitled to summary judgment on the § 1981 claims.**

The College contends it is entitled to summary judgment on Scarlett's § 1981 claims because (1) he has not produced direct evidence of discrimination; (2) he has not established a prima facie case of discrimination; and (3) he has not established pretext. Ultimately the jury will have to judge the witnesses credibility and make the determination whether Dr. Davidson and the College acted with discriminatory intent.

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . ." 42 U.S.C. § 1981(a). "[T]he term 'make and enforce contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Section 1981 does not provide a general cause of action for private racial discrimination, there must be some contractual relationship between the parties. *See Youngblood v. Hy-Vee Food Stores, Inc.*, 266 F.3d 851, 855 (8th Cir. 2001). But the Supreme Court has held that §1981 prohibits racial discrimination in admission to educational programs. *Runyon v. McCray*, 427 U.S. 160, 172 (1976).

**A.      Scarlett has not produced direct evidence of discrimination.**

Scarlett contends he was denied admission to the dorms and timely re-entry to the College as a result of racial discrimination. There is no direct evidence of discrimination here. Direct evidence of intentional discrimination is "evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion ultimately motivated the . . . action." *Russell v. City of Kansas City, Mo.*, 414 F.3d 863, 866 (8th Cir. 2005). "Direct evidence provides a

strong causal link between the alleged discriminatory bias and the adverse [action]. It most often comprises remarks by decisionmakers that reflect, without inference, a discriminatory bias." *McCullough v. Univ. of Arkansas*, 559 F.3d 855, 861 (8th Cir. 2009) (internal citations omitted). No administrator at the College ever said anything to Scarlett about his race, or did anything that without inference evidences a discriminatory bias. Scarlett's contention that he has provided direct evidence by showing that Davidson checked-up on him by seeing if he was supposed to be at work when he was playing basketball, falls short. The fact that Davidson checked up on Scarlett establishes, at most, that Davidson did not like Scarlett and was hoping to catch him breaking work rules. It does not establish a strong causal link that the decision to deny Scarlett dormitory housing or re-admission to the College was based on race.

      **B.     There is indirect evidence of discrimination and pretext.**

Because there is no direct evidence of discrimination here the Court analyzes Scarlett's § 1981 claims under the familiar burden shifting framework of *McDonnell Douglas Corp. v. Green*. Under this framework the plaintiff must first establish a prima facie case of discrimination, if he does so then the defendant must "articulate some legitimate, non discriminatory reason for its actions." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the defendant satisfies this burden of production, then the burden shifts back to the plaintiff to present evidence sufficient to demonstrate that the proffered reason is merely a pretext for discrimination. *Id.* at 804.

To establish a prima facie case of discrimination under § 1981 a "plaintiff must show (1) he is a member of a racial minority, (2) the defendant intended to discriminate against him on the basis of race, and (3) the discrimination concerned an area" of activity protected by the statute. *Williams v. Lindenwood Univ.*, 288 F.3d 349, 355 (8th Cir. 2002). For purposes of the summary

judgment motion the College does not dispute that Scarlett is a member of a racial minority, or that § 1981 prohibits discrimination in college admissions and college housing, the College simply denies that any decisions were made with a discriminatory motive.

Viewing the record in the light most favorable to the Plaintiff and giving him the benefit of all reasonable inferences, the Court finds a reasonable juror could infer that race was a determinative factor in the decisions to deny Scarlett entrance to the dorms and initially deny him re-admission to the College. A reasonable juror could find that Scarlett's work performance was adequate; that the College did not have any policies requiring Scarlett to be repeatedly placed on work probation; that Davidson repeatedly treated similarly situated white students differently than Scarlett; that a similarly situated white student would not have been dismissed from the work program; that Davidson's assertion that the work program is partially governed by unspecified unwritten policies and understandings is incorrect; and that Davidson's decisions were motivated by racial animus.[2]

The burden then shifts to the College to articulate a legitimate, non discriminatory reason for its actions. It has done so. There is evidence on the record that Scarlett was a marginal student with a marginal work record; that Davidson excluded Scarlett from the work program because he was violating unwritten policies, and not because of his race; and that the other administrators' decisions which were based in part on Davidson's input were not race-based either.

Finally, turning to the question of pretext, the Court finds that viewing the evidence in the light most favorable to the Plaintiff, a reasonable juror could find that Davidson's proffered

---

[2] The Court emphasizes that it is viewing the record in the light most favorable to the Plaintiff and giving him the benefit of every reasonable inference. It is not expressing its view on the merits of this case.

explanations for his decisions and subsequent actions are pretextual, and that his decisions were motivated by racial animus.

In sum, the record here is such that a jury will have to hear the witnesses' testimony and make credibility determinations, something the Court cannot do on a summary judgment motion.

## II. The College is not entitled to summary judgment on the Title VI claims.

The relevant portion of Title VI of the Civil Rights Act of 1964 states that, "No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

### A. Scarlett has standing to sue under Title VI.

Defendant argues that Scarlett lacks standing to bring a Title VI claim because while he was attending the College he was a non-resident alien temporarily in the United States on a student visa and ineligible to be a recipient of any federal student aid. As a result "he cannot be an intended beneficiary of a federally funded program" and lacks standing to bring this lawsuit.

There is no merit to this claim. A foreign student attending a university receiving federal funds has standing to sue for intentional discrimination under Title VI. *Tayyari v. New Mexico State Univ.*, 495 F. Supp. 1365, 1370-71 (D.N.M. 1980). Congress enacted the Civil Rights Restoration Act of 1987 to make clear that the term "program or activity" includes all of an entities' operations, thus any university receiving federal funds may not discriminate against any person in any of its programs on the basis of race, color, or national origin. *DeVargas v. Mason & Hanger-Silas Mason Co., Inc.*, 911 F.2d 1377, 1383-84 (10th Cir. 1990).

**B.      Scarlett has not produced direct evidence of discrimination.**

As discussed above in part I of this order, Plaintiff has not produced any direct evidence of discrimination.

**C.      There is indirect evidence of discrimination and pretext.**

Because Plaintiff does not have direct evidence of discrimination he must prove intentional discrimination under the *McDonnell Douglas* burden shifting framework discussed above.  To establish a prima facie case of discrimination under Title VI, the plaintiff must show (1) that the defendant is receiving federal funds, (2) that the plaintiff was discriminated against, and (3) the plaintiff's race, color, or national origin was the motive for the discriminatory conduct.  *See Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001); *Jackson v. Conway*, 476 F. Supp. 896, 903 (E.D. Mo. 1979); *see also Thompson v. Bd. of the Special School Dist. No. 1*, 144 F.3d 574, 581 (8th Cir. 1998).  The College agrees that it receives federal funds, but disputes that it discriminated against Scarlett on the basis of his race.  The parties' arguments here mirrors those made on the § 1981 claims, and the Court's analysis is the same:  The Court finds Scarlett has established a prima facie case that he was discriminated against on the basis of his race; the College has articulated a legitimate, non discriminatory reason for its actions; and Scarlett has presented sufficient evidence of pretext to allow this case to proceed to trial.

**D.      Plaintiff may recover non-economic damages on his Title VI claim.**

The College argues that Scarlett may not recover for non-economic compensatory damages such as mental anguish, emotional distress, damage to reputation, lost income, and violation of his civil rights on his Title VI claims.  The Supreme Court has held that recoverable damages under Title VI is limited to "forms of relief traditionally available in suits for breach of contract," that is, compensatory damages and injunctions.  *Barnes v. Gorman*, 536 U.S. 181,

187-88 (2002) (holding punitive damages are not recoverable). It has never expressed an opinion whether non-economic compensatory damages are available. *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1191-92 (11th Cir. 2007). The only federal court of appeal that has considered the question, however, has issued a thoughtful and exhaustive opinion holding that they are available. *Id.* at 1198-1203. The Court agrees with the Eleventh Circuit's analysis and finds Scarlett is not precluded from recovering non-economic damages as a matter of law. Of course, whether the evidence at trial will support an award of such damages remains to be seen.

### E. Any Title VI claims arising before August 29, 2004 are time-barred.

Finally, the College argues that Scarlett's Title VI claims are subject to a five-year statute of limitations. Scarlett filed his lawsuit on August 31, 2009, thus any claims arising before August 29, 2004 are time barred. The College further suggests that allegations one and two in paragraph sixty-three of the Complaint (alleging that the College placed Scarlett on work probation without justification and demoted him to an undesirable work station) arose before August 29, 2004, and are time-barred. Plaintiff does not dispute this analysis.

The Court awards Defendant partial summary judgment on allegations one and two in paragraph sixty-three of the Complaint because these claims are barred by the applicable statute of limitations.

## Conclusion

The Court holds Plaintiff Scarlett has not produced any direct evidence of discrimination, but finds there is sufficient circumstantial evidence to establish a prima facie case of race discrimination under both § 1981 and Title VI. Although the College has articulated a legitimate, non-discriminatory reason for its actions, Scarlett has presented sufficient evidence of

pretext to allow these claims to proceed to trial.  A five-year statute of limitations applies to Plaintiff's Title VI claims, however, thus allegations one and two in paragraph sixty-three of the Complaint which arose before August 29, 2004, are time-barred.  The Court grants Defendant summary judgment on these two claims.

**IT IS SO ORDERED.**

Date:   January 24, 2011                     /s/ Greg Kays
                                            GREG KAYS, JUDGE
                                            UNITED STATES DISTRICT COURT